Argued June 29, affirmed July 18, reconsideration denied August 24, 1977, petition for review pending

STATE OF OREGON, *Respondent,*
*v.*
GARY WILLIAM WARNER, *Appellant.*
(No. 76-1050-C, CA 7784)

566 P2d 546

Robert C. Cannon, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

John W. Burgess, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Lee, Judges.

THORNTON, J.

## THORNTON, J.

Defendant was convicted after jury trial of the crime of robbery of a Grants Pass tavern. The sole issue presented in this appeal is whether the trial court erred in denying defendant's motion to suppress evidence connecting defendant with the robbery, which evidence was seized during a warrantless search by police of defendant's automobile.

The statement of facts of necessity must be detailed.

At about 11 p.m. on the evening of November 7, 1976, Officers Myers and Beasley of the Rogue River Police Department while riding in their patrol car received a radio bulletin of an armed robbery of a named tavern in Grants Pass. The city of Rogue River is approximately eight miles from Grants Pass. The report indicated that two men with ski masks and a shotgun had staged the robbery. Shortly after receiving the report the officers decided to stop at the Homestead Tavern in Rogue River. They arrived at the tavern approximately 10 minutes after hearing the report of the robbery. When they arrived, they saw a car "pulling up to the front of the building [Homestead Tavern]." Two men, who were not dressed as reported in the bulletin, got out of the car and entered the tavern.

After waiting in the patrol car for a few minutes, the officers entered the tavern. Myers was in uniform; Beasley was in civilian clothes. Officer Myers ordered two cups of coffee and walked through the tavern area. They saw four people sitting at the bar: the same two men, defendant and his companion, Richard Carlin, were sitting together at the end of the bar; another man and a woman were also sitting at the bar. Officer Myers asked the bartender to be on the lookout for anyone flashing a large amount of money. Officer Myers testified that defendant and Carlin were "[t]alking in very low tones of voice looking at us,

looking at each other, looking back at us." Shortly thereafter the bartender asked Myers to step into the backroom. He told Myers that one of the pair, Carlin, pulled a wad of money "the size he'd never seen before." Myers walked back into the bar and advised Officer Beasley of the bartender's conversation and they continued to observe the defendant and Carlin sitting at the bar, approximately 15 feet away. Myers left the tavern briefly and contacted his dispatcher by radio to see if any additional information had been reported concerning the armed robbery. The dispatcher advised that no additional information was available. Myers returned to the tavern. Shortly thereafter he again went to his car and advised his dispatcher that he was keeping the two subjects under surveillance in regard to the possible armed robbery and he requested backup units both from the county sheriff and his own city police department, and returned to the tavern. Myers thereafter left the tavern and walked up to the automobile which the two men had driven and parked in front of the tavern. The officer shined his flashlight through the window in an effort to observe the contents of the vehicle. He observed nothing out of the ordinary. At that moment defendant and Carlin emerged from the tavern. Officer Myers testified that under the circumstances he felt the need to ask them some questions. Therefore he asked them to go back inside the tavern. The officer did not have his gun drawn and defendant and Carlin did not object to returning into the tavern. He then asked them to place their identifications and wallets on the table inside the front door. Officer Myers explained to them the reason for his request. He testified that he told them he had received a report of a robbery in Grants Pass and that he would like to ask them about this. He told them "as soon as possible we would clear this matter up, and they would be on their way." Officer Myers further testified that defendant and Carlin appeared to understand his explanation for asking them to identify themselves. They placed their identification and wallets on the table. Officer Myers

testified that "[t]hey indicated a willingness to comply."

After seeing defendant's and Carlin's identification Myers asked them if they would walk out to the patrol car so that he could run DMV and warrant checks on them.

Officer Myers testified that he asked them to go outside to his patrol car to find out if they were in fact who they said they were and if there were any warrants out for them. Officer Myers indicated that if defendant and Carlin had refused to accompany him outside he would not have stopped them. Neither defendant nor Carlin objected to going outside with the officers to the patrol car. Officer Beasley who had been elsewhere, joined Officer Myers, defendant and Carlin. Once outside Officer Myers asked defendant and Carlin where they had been earlier in the evening, and they replied, "Grants Pass." Officer Myers began checking to see if there were any outstanding warrants on the pair. Defendant and Carlin stood outside the patrol car while Officer Myers made his radio check. At that point about five minutes had elapsed from the time Officer Myers first met the defendant and Carlin until the time he began checking on outstanding warrants. While Officer Myers was still making his radio check, other backup officers arrived. At that point about five to ten minutes had elapsed since Officer Myers had first met defendant and Carlin. Officer Myers advised Chief Hinrich of the Rogue River City Police Department, the senior officer who had by then arrived at the scene, of the facts contained in the radio report as to the armed robbery. Chief Hinrich then walked over to defendant and Carlin and asked them if they would mind emptying their pockets on the hood of the car. Neither defendant nor Carlin objected to Chief Hinrich's request. Carlin placed a large amount of paper money and several .38 caliber hollow point bullets on the hood. Defendant placed two rounds of 20 gauge shotgun shells on the hood. When Chief Hinrich saw the ammunition, he

[ 121 ]

drew his gun and ordered both defendant and Carlin to "freeze." Chief Hinrich knew that the radio report of the incident said that one of the robbers carried a shotgun and that "hollow point" bullets have a greater stopping power than solid bullets.

When Officer Myers heard Chief Hinrich tell defendant and Carlin to "freeze," he dismounted from the patrol car with his gun drawn; however Officer Myers holstered his gun when he saw Chief Hinrich begin a pat down search of defendant and Carlin. Chief Hinrich also put his gun down to conduct the pat down. He found no weapons on defendant and Carlin. Chief Hinrich asked defendant for permission to search the interior of his automobile. Defendant answered, "[t]he doors are open, help yourself." Chief Hinrich opened the car door, looked underneath the driver's bucket seat and found "two cotton type ski hats" with holes cut out of them. He also found a green coin tray between the seats, a gold colored money bag and rolls of coins as well as loose coins on the floor. Chief Hinrich then arrested defendant and Carlin. Defendant was asked if the officers could search the trunk of the car, and defendant indicated he did not care if they did. The officers opened the trunk and found a shotgun, a bag of money and some clothing.

The main thrust of defendant's argument is that the police did not have reasonable suspicion to stop defendant and his companion outside the Rogue River tavern and inquire concerning an armed robbery which had just occurred in Grants Pass; that the police lacked probable cause to then search them. In addition defendant argues that the automobile search was invalid because the police, prior to obtaining defendant's consent to the search, failed to advise defendant that he had a constitutional right to refuse the requested search.

▪ After analyzing the above facts and defendant's arguments, we conclude that the trial court did not err in overruling defendant's motion to suppress the

evidence seized. Contrary to defendant's argument, we regard the initial stopping of defendant and his companion for questioning outside the Homestead Tavern as amply justified by the circumstances, as well as by ORS 131.615.[1] We do not regard it as a "stop" defined in ORS 131.605(5).[2] There was no restraint of defendant's liberty "by means of physical force or show of authority." *Terry v. Ohio,* 392 US 1, 19, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

■ Not every preliminary inquiry by a police officer of a citizen, whether he be a pedestrian or a motorist, is a "stop" within the meaning of ORS 131.605(5). *See, State v. Harris,* 25 Or App 71, 547 P2d 1394, Sup Ct *review denied* (1976); *State v. Ward,* 16 Or App 556, 519 P2d 1269, Sup Ct *review denied* (1974).

As the United States Supreme Court observed in *Adams v. Williams,* 407 US 143, 145, 92 S Ct 1921, 32 L Ed 2d 612 (1972):

"* * * The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*Terry v. Ohio*] recognizes that it may be the essence of good police work to adopt an intermediate response. * * *"

■ Probable cause to arrest need not be shown before

[1] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

*See also, State v. Evans,* 16 Or App 189, 517 P2d 1225, Sup Ct *review denied* (1974).

[2] ORS 131.605(5) provides:

"As used in ORS 131.605 to 131.625, unless the context requires otherwise:

"* * * * *

"(5) A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

an officer can undertake a preliminary inquiry as to an alleged crime. *Terry v. Ohio, supra.*

■ The strength of the information that the officer requires to engage in questioning is necessarily much less than it would be to arrest and search. *People v. King,* 175 Cal App2d 386, 346 P2d 235 (1959).

■ That the consent of the defendant and his companion to the Myers' request for identification was voluntarily given is resolved by the trial judge's ruling on defendant's motion to suppress, and is binding on us under *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

■■ Next, we conclude that Chief Hinrich's subsequent part in the on-the-scene investigation did not involve any denial of defendant's constitutional rights. Chief Hinrich, as did Officer Myers a few minutes earlier, *asked* defendant and Carlin "if they'd mind emptying their pockets out on the hood of the car," and they voluntarily complied. When he saw the hollow point bullets and two shotgun shells, he was entitled as a matter of safety to take steps to look for weapons in the vicinity matching those shells by patting down the defendant and his companion and checking out defendant's nearby automobile. *State v. Riley,* 240 Or 521, 402 P2d 741 (1965); *State v. Fent,* 29 Or App 249, 562 P2d 1239 (1977); *State v. Ward, supra.* It was in the course of this latter search that Chief Hinrich discovered the ski masks, the money bag and later the shotgun. As our Supreme Court said in *State v. Riley,* supra:

> "* * * To justify the seizure of a weapon which could be used against the arresting officer we shall not draw a fine line measuring the possible risk to the officer's safety. The officer should be permitted to take every reasonable precaution to safeguard his life in the process of making the arrest." 240 Or at 524-25.

See also, *State v. Wright,* 30 Or App 11, 566 P2d 185 (1977). Nor is it fatal to this search that Chief Hinrich did not testify that his reason for looking inside

defendant's automobile was that he was searching for a gun. *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969).

Defendant does not contend that his consent to the car search was involuntarily given. Rather, he relies upon *State v. Williams,* 248 Or 85, 432 P2d 679 (1967), and *State v. Douglas,* 260 Or 60, 488 P2d 1366 (1971), *cert denied* 406 US 974 (1972), and argues that

"* * *before a consent to search can be obtained, the officer * * * must affirmatively inform the defendant of his Fourth Amendment Right to refuse the consent to search."

■ While it is true that in *Williams* and *Douglas* our Supreme Court, relying on the Fourth Amendment to the United States Constitution, has said that such advice must be given before a consent is valid, the United States Supreme Court has since rejected the argument that the consent search is unlawful unless the police had first informed the person in custody of his right to refuse to consent to the search. *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976).

In *Watson* the Supreme Court said:

"* * * [T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under Schneckloth [*Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973)], *the absence of proof that Watson knew he could withhold his consent,* though it may be a factor in the overall judgment, is not to be given controlling significance * * *." (Emphasis supplied.) 423 US at 424.

Defendant places considerable reliance on *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977). In *Valdez* our Supreme Court held that a stop of an automobile carrying three individuals in an area often frequented by law violators, where the officers had observed one of the suspects making a possibly furtive gesture a few moments before, was unauthorized.

The present case differs factually from *Valdez* in several important respects. In *Valdez* no felony had been committed, no radio bulletin had been broadcast; the so-called furtive gesture was not sufficiently suspicious to justify the stop and search. Apart from the gesture, there were no suspicious circumstances pointing to the suspects, such as the possession of a large "wad" of currency by Carlin in the case at bar.

■ We agree with the trial judge that the action of the police here was reasonable under all the circumstances. It is not necessarily incumbent on police officers to seek a search warrant during the course of an on-going police investigation. Certainly they were not required to stop their investigation until they could apply to a magistrate for a search warrant. *State v. Taggart,* 14 Or App 408, 512 P2d 1359 (1973), Sup Ct *review denied, cert denied* 419 US 877 (1974). *Accord: State v. Wright, supra.*

Affirmed.