Argued January 13, reversed and remanded October 24, 1978

# STATE OF OREGON, *Respondent,*
## *v.*
# GARY WILLIAM WARNER, *Petitioner.*
## (TC 76-1050-C, CA 7784, SC 25562)

585 P2d 681

Robert C. Cannon, Deputy Public Defender, Salem, argued the cause for petitioner. With him on the brief was Gary D. Babcock, Public Defender, Salem.

John W. Burgess, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, Salem, and W. Michael Gillette, Solicitor General, Salem.

LENT, J.

Tongue, J., filed concurring opinion, in which Howell, J., joined.

**LENT, J.**

Defendant was convicted by a jury of robbery in the first degree after the trial court denied his motion to suppress evidence seized by the police in a warrantless search of his person and automobile. Defendant appealed to the Court of Appeals, which, in *State v. Warner,* 30 Or App 117, 566 P2d 546 (1977), affirmed the conviction. We allowed defendant's petition for review to consider, in general, the application of some of the statutory and constitutional rules concerning "street encounters" and, in particular, application of those rules to this case. We also believed there may have been a misapplication by the Court of Appeals of the doctrine of *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), concerning the appellate function in determining the voluntariness of a consent to a search or seizure.

As we have had occasion to note in the past, determination of the legality of searches and seizures depends largely upon the facts of each case, *State v. Blackburn/Barber,* 266 Or 28, 30, 511 P2d 381 (1973), and as Chief Justice Warren said in *Terry v. Ohio,* 392 US 1, 13 (1968):

> "* * * Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. * * *"

This case amply illustrates almost the full gamut.

On November 7, 1976, two Rogue River policemen were patrolling in a marked police car in Rogue River, a small community located about eight miles from Grants Pass. One, Officer Myers, who had been a reserve officer for about three months, was in uniform, while the other, Officer Beasley, was off duty and in civilian clothes. At approximately 11:00 p.m. Officer Myers received a dispatch on his radio indicating the following information:

(1) There had been an armed robbery at the Owl Club in Grants Pass;

(2) Two male suspects were involved;

(3) One was armed with a shotgun;

(4) One suspect wore plaid pants, while the other wore purple pants;

(5) Both suspects wore ski masks; and

(6) Money was taken.

The dispatch did not contain any of the following information:

(a) a physical description of either of the two male suspects; i.e., height, weight, race, etc.;

(b) the amount of money taken or the amount or denomination of coins or bills;

(c) a description of a vehicle involved in the robbery or that any vehicle was involved; or

(d) the exact time the robbery took place.

At about 11:10 p.m. Officers Myers and Beasley saw an automobile pull up to the front of the Homestead Bar in Rogue River. The officers saw two men getting out of the car and entering the bar. The officers waited outside for about ten minutes and then decided to enter the bar for a "routine check." They parked their car at the rear of the tavern, entered, sat down at one end of the bar and ordered two cups of coffee. Officer Myers proceeded to walk to the rear of the bar "to check on individuals in the bar." Other than the two officers, only three male patrons, one female patron and the bartender were present. As Officer Myers returned, a man named Carlin sitting at the other end of the bar, who, as it turned out, was with the defendant, asked Officer Myers in a casual, conversational tone, if he had been keeping busy. Officer Myers replied that he was trying to and returned to his seat next to Officer Beasley.

At that time Officer Myers asked the bartender if anybody had been flashing any money or acting suspiciously. The bartender answered in the negative,

but two or three minutes later the bartender returned to where Officer Myers was sitting and asked him to step into a back room, where the bartender told him that one of the two men at the far end of the bar (Carlin) had "just pulled out a wad of money, the size he'd never seen before." At this point Officers Myers and Beasley began observing the two men at the far end of the bar more closely. Neither man wore clothes similar to those described in the dispatch. Officer Myers testified that they were "talking in very low tones of voice, looking at us, looking at each other, looking back at us." Officer Myers went out to his police car and requested more information on the robbery and suspects, but none was available. Officer Myers returned to the bar and continued to observe the two men. Sometime later he went back to his police car, advised the dispatcher that he had two possible suspects in the armed robbery under surveillance and advised the dispatcher to call Chief Hinrich and Sergeant Ring of the Rogue River Police Department and to send county sheriff backup units.

Officer Myers then entered the bar for the third time, advised Officer Beasley of what he had done, and went back out the front door to observe the automobile in which, he believed, the two men had arrived. As Officer Myers began to shine his flashlight into the front seat of the automobile, he observed the two suspects walking out of the front door of the bar. At this point the testimony differs somewhat. Officer Myers testified:

"On seeing the two gentlemen walking out of the front door, I felt that I had need to ask questions of the two gentlemen so I *asked* them to return to the inside of the bar, remove their wallets from their pockets, take their ID out and place them on the table in front of them." (emphasis added)

The two men complied.

Myers further testified concerning this "street encounter" as follows:

[ 151 ]

"Q. You stopped Mr. Carlin and Mr. Warner as they had finished their drinks and were leaving, is that correct?

"A. That's correct.

"Q. Where did you stop them; was that inside the Homestead?

"A. No, sir, they were outside the front door of the Homestead."

Carlin testified that as he and the defendant were walking toward the door Officer Myers entered the bar and stated, "I want to know who you are, show me your ID." Defendant corroborated the location of this initial encounter.

Officer Myers then testified that he accompanied the two back into the bar, asked them to put their ID's on a table near the door, told them of the armed robbery in Grants Pass and said he would like to ask them some questions. He neither told them that they were under arrest nor that they were free to leave, but said:

"I told them as soon as possible we would clear this matter up and they would be on their way."

After looking at the ID's of the two suspects, Officer Myers, according to his own testimony, "asked" them to walk out the back door to his police car so he could run Division of Motor Vehicles and warrant checks on them. The two complied. Carlin testified that after looking at their ID's Officer Myers said, "I don't want any trouble in here, we're investigating an armed robbery. Step to the rear of the building." In any case they complied, and the group proceeded out the rear door of the bar to the police car in back.

Officer Myers testified that it was the money which made him suspicious, although he did not know the denominations or sum which Carlin had. Apparently, on their way through the bar, Officer Myers asked Carlin about the "wad" of money. Officer Myers testified as follows:

"Q. Now, you inquired about the wad of money?

"A. About the wad of money.

"Q. You asked why they had money or what the purpose of the money was?

"A. I did.

"Q. What was the response?

"A. Mr. Carlin advised me he was a poker dealer in the city of Phoenix, which seemed entirely normal. He could very well have been a poker dealer.

"Q. So at that point, the wad of money was explained to your satisfaction; you were no longer suspicious about it?

"A. About the money, that's correct."

Myers conceded that from the time he was satisfied with the explanation about the money he was "fishing": [*see* n.7 *infra*]

"Q. You had no reason to stop them, you were just continuing—

"A. Just continuing with preliminary investigation to find out if they were in fact who they say they are, if there were any warrants on them. There were no warrants on either of the two subjects.

"Q. Just sort of a fishing expedition to see if you could find—

"A. That's right."

Officer Myers testified that in response to a question the two told him they had been in Grants Pass 45 minutes before. Officer Myers then entered the car, while Officer Beasley remained outside with defendant and Carlin. Officer Myers contacted the dispatcher and gave him the driver's license numbers of the two.

At this point, which was five to ten minutes from the first direct encounter, Chief Hinrich and Officer Ring, who had parked their individual cars in the front of the bar, arrived at the police car at the rear of the bar. Officer Myers asked the Chief to get defendant's automobile license number, which he did. Officer Myers reported it to the dispatcher and learned that the vehicle was properly registered to the defendant.

Chief Hinrich had been contacted at his home at approximately 11:30 p.m. and arrrived at the Homestead Bar about five minutes later. At the time he

arrived, Chief Hinrich knew only what the dispatcher had told him—that Officers Myers and Beasley had two possible armed robbers at the Homestead and required a backup. He was not aware of the armed robbery in Grants Pass. When Chief Hinrich returned with the license number, he got in Myers' vehicle and was told of the details of the earlier dispatch—but nothing of the men's allegedly suspicious behavior or the wad of money. After acquiring this information, Chief Hinrich got out of the vehicle, approached the two and, as he put it, "*asked* if they'd mind emptying their pockets on the hood of the car." (Emphasis added) Carlin testified that Chief Hinrich walked up and said, "All right, empty your pockets." In any case, both complied.

By this time, two more uniformed police officers from the county sheriff's department arrived in separate police cars. Thus, the two were confronted by six officers and three marked police cars.

The chronology of the next series of events is somewhat confused, but from the record as a whole it appears that Carlin first emptied his pockets on the hood of the police car. His first handful produced a large amount of paper money; the second, a large amount of change and several .38-caliber hollow point bullets. At that point, Chief Hinrich told the two to "freeze"[1] and drew his handgun. When asked why he took this action, Chief Hinrich testified that he recog-

---

[1] It is of some interest to note that the state's position before the trial judge on the motion to suppress was that no detention or "stop" had as yet occurred, even at the point where the Chief said "freeze." With respect to that, Officer Myers testified that the two "subjects" were then standing at the front of his police vehicle, that there were present three uniformed police officers, three ununiformed police officers, three marked patrol cars, and two unmarked police cars, that two officers (Myers and the Chief) had their guns drawn, and that the two uniformed deputy sheriffs possibly had their guns drawn. He then testified as follows:

"Q. At this point, was Mr. Carlin and Mr. Warner free to leave?
"A. I would assume so at this time, yes, sir."

With respect to that point in time, the Chief testified (apparently to

nized the bullets produced by Carlin as a kind ordinarily used by police officers and designed specifically for stopping power.

When Officer Myers heard Chief Hinrich yell "freeze," he immediately "exited" his police car and drew his weapon. Chief Hinrich then conducted a patdown frisk and found no weapons, whereupon both officers holstered their guns. After the patdown, the defendant and Carlin continued to empty their pockets. When their pockets were empty, there were two .20-gauge shotgun shells on the hood of the car. Defendant denied the shells were his, as did defendant's companion. Both Chief Hinrich and Officer Myers testified they did not see where the shells had come from. At that point Chief Hinrich testified he asked defendant's permission to search the interior of his automobile. Officer Myers testified that defendant replied, "The doors are open, help yourself." Carlin testified he was in a position to hear such an exchange and did not hear it. Defendant flatly denied giving Chief Hinrich consent to search his automobile.

Defendant was accompanied by Chief Hinrich, Officer Myers, and Officer Ring through the bar to the front where defendant's automobile was parked. Chief Hinrich opened the door, searched the interior and found several rolls of coins, a green coin tray, a gold-colored money bag, two pairs of shoes and two ski hats with two holes cut in each. At this point, as Chief

---

dispel any thought that defendant and Carlin were being detained) as follows:

"Q. * * * When you ordered the two defendants to freeze at that point, were they free to leave?
"A. Yes.
"Q. So you ordered them to freeze. If they'd walked away, you would not have stopped them?
"A. I would have tried to pat them down.
"Q. As they're walking?"

The court sustained an objection to the last question as being argumentative.

Hinrich testified, he "figured [he] had enough probable cause for arrest." Defendant was informed he was under arrest and was handcuffed.

There is some dispute in the state's evidence about what happened next. Officer Myers testified that one of the police officers asked if they could look in the trunk of the automobile, to which defendant replied, "I don't give a fuck, the keys are in my pocket." Then, according to Officer Myers' testimony, one of the sheriff's deputies took the keys from defendant's pocket and opened the trunk. The trunk was opened and searched. A shotgun, a pair of purple pants, a pair of plaid pants, and a bag of money were found. Chief Hinrich appeared to testify that the trunk was opened without seeking or obtaining defendant's consent. Defendant denied giving consent to search the trunk.

Carlin was arrested, and both defendant and his companion were charged with robbery. Defendant separately moved for the suppression of all of the items seized as a result of the warrantless searches of his person (shotgun shells) and his automobile interior and trunk. His motion was denied. He was tried before a jury, the evidence in question was admitted against him, and he was convicted of robbery in the first degree.

*Appellate Review of Issue of Valid Consent*

Before proceeding to the question of review on the merits, we must determine the scope of our review. In *Ball v. Gladden, supra,* we attempted to fix the proper scope of appellate review concerning the voluntariness of admissions and confessions and thereby to divide between the trial court and the appellate court certain constitutional responsibilities. In that respect we said:

> "What actually transpired is a question of fact for the trial court or jury. If the evidence sustains such historical factual findings they will not be disturbed by this court. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were

[ 156 ]

decided in a manner consistent with the ultimate conclusion, e.g., voluntariness or lack thereof, made by the trial court or jury. Whether these historical facts as found are sufficient to sustain a finding of voluntariness which meets state and federal constitutional concepts of due process is another question, and one which falls within our proper scope of appellate review. The federal court also exercises this scope of review. Clewis v. Texas, 386 US 707, 87 S Ct 1338, 18 L ed2d 423, 426 (1967); Davis v. North Carolina, 384 US 737, 86 S Ct 1761, 16 L ed2d 895, 898-899 (1966); Haynes v. Washington, 373 US 503, 83 S Ct 1336, 10 L ed2d 513, 522 (1963); Culombe v. Connecticut, 367 US 568, 81 S Ct 1860, 6 L ed2d 1037, 1058-1059 (1961). In other words, we are not bound by a trial judge or jury's finding of voluntariness if we believe the historical facts upon which such finding is based are insufficient to meet constitutional standards of due process. This is pursuant to our duty to interpret constitutional standards and require conformance thereto." 250 Or 487-88.

As recently as June 21, 1978, in *Mincey v. Arizona,* — US —, 98 S Ct 2408, 2417, 57 L ed2d 290 (1978), the United States Supreme Court reaffirmed this scope of appellate review with respect to the voluntariness of a defendant's statements.

In the case at bar the Court of Appeals stated:

"That the consent of the defendant and his companion to the Myers' [police officer's] request for identification was voluntarily given is resolved by the trial judge's ruling on defendant's motion to suppress, and is binding on us under [Ball v. Gladden]." 30 Or App at 124.

We first note that *Ball v. Gladden, supra,* is concerned with a Fifth/Fourteenth Amendment situation. This case, insofar as federal constitutional ramifications may be present, is concerned with a Fourth/Fourteenth Amendment problem. In this context what is to be the proper division of constitutional responsibilities? In *State v. Douglas,* 260 Or 60, 488 P2d 1366 (1971), after indicating that whether valid consent to a search is given is generally held to be "a question of fact," we went on to note the *Ball* doctrine.

There was no question of whether the *Ball* doctrine should be applicable to review of a specific or implied finding of "consent" to a search. The opinion simply seems to assume that it is applicable. Citing *Douglas* and *Ball*, we again assumed without discussion the applicability of *Ball* to search cases in *State v. Blackburn/Barber, supra,* although that case did not involve the issue of "consent."

■■ We now specifically hold that an appellate court is not bound by a trial judge's finding of voluntariness of consent to a search or seizure if the appellate court finds the historical facts upon which the trial judge made his finding are insufficient to meet constitutional standards of due process.[2] It follows, therefore, that neither the Court of Appeals nor this court is bound by

[2] The United States Supreme Court refuses to be bound by the holding of the highest appellate court of a state. *Mincey v. Arizona,* — US —, 98 S Ct 2408, 2417, 57 L ed2d 290 (1978). *Compare State v. Krogness* (both majority and dissenting opinions), 238 Or 135, 388 P2d 120 (1964).

"Critics of the search and seizure exclusionary rule try to distinguish away the coerced confession cases, and for good reason. For once it becomes clear that the rationale of the coerced confession cases 'has been expanded beyond protect[ing] the individual from conviction on unreliable or untrustworthy evidence' to 'strik[ing] down police procedures which in their general application appear to the prevailing justices as imperiling basic individual immunities,' as Professor Francis Allen pointed out a quarter of a century ago, then it becomes most difficult to distinguish the problem of the admission of unconstitutionally seized 'real' evidence from that of involuntary confessions. For '[i]n both situations the perils arise primarily out of the procedures employed to acquire the evidence rather than from dangers of the incompetence of the evidence so acquired.'

"Although those unhappy with the exclusionary rule still make the claim that the admissibility of unconstitutionally seized 'real' evidence and 'involuntary' confessions 'raise entirely different questions,' the argument comes about 30 years too late.

"It is interesting to note that at one point Chief Justice Warren's opinion for the Court in the famous *Spano* case reads like a restatement of the reasoning in *Weeks* and the Holmes-Brandeis dissents in *Olmstead*:

" 'The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' "

(footnotes omitted) Y. Kamisar, "Is the Exclusionary Rule an 'Illogical' or 'Unnatural' Interpretation of the Fourth Amendment?" 62 Judicature 66, 77 (August 1978).

the implicit conclusion of the trial judge in this case that defendant's compliance with Myers' "request for identification" was voluntary.

The Court of Appeals "conclude[d]" (30 Or App 124) that Chief Hinrich's subsequent part in the investigation did not involve any denial of defendant's constitutional rights because the Chief, "as did Officer Myers a few minutes earlier, *asked* [original emphasis] defendant and Carlin 'if they'd mind emptying their pockets out on the hood of the car,' and they voluntarily complied."

The fact that the Court of Appeals saw fit to emphasize that the Chief and Officer Myers "asked" defendant and Carlin to do certain things as hereinbefore described points up a problem for appellate courts present in, but not confined to, this case. The problem arises from the fact that counsel and the trial court fail to make a record as to what the witness actually contends was said. Both Officer Myers and the Chief repeatedly testified that they "asked" the defendant and Carlin to do certain things. It is extremely doubtful that either said something to the effect, "I ask you to return to the bar," for example. Persons rarely use the word "ask" in that manner. What Myers may have actually said may range from something like "Please, step back into the bar as a favor to me," to "I want to know who you are, show me your ID," as testified to by Carlin. The appellate courts in this case simply do not know from Myers' testimony what he claims his exact words to be.

We have the same problem with respect to Chief Hinrich's testimony. For instance, with respect to the Court of Appeals' conclusion that the Chief "asked" the men to empty their pockets on the hood of the car, it is interesting to note his exact testimony concerning his own concept of what he may mean by the term "asked." On direct examination by the district attorney, the Chief testified:

[ 159 ]

"Q. Well you recognized this as hollow point ammunition?

"A. That's correct.

"Q. And what did you do immediately upon *asking* them to freeze?

"A. I *asked* them if they'd put their hands in [sic] the front of the vehicle so I could search for a weapon.

"Q. Okay, and what—did they comply with that *command?*

"A. Yes, sir, right away." (Emphasis added)

Again, we have no testimony by the Chief as to the words he claims to have actually used when he "asked" the two men to do certain things. Again, his "request" may have been either the most imaginably polite solicitation to act, at one end of the spectrum, to the most arrogant order ("command?") to perform at the other, or, of course, something in between.

The problem for the appellate court is akin to that in which the record brought to the appellate court concerns evidentiary maps or diagrams concerning which witnesses have given "here" and "there" testimony. Without the trial judge and counsel insisting that "here" and "there" be properly identified on the diagram, the appellate court is at a distinct disadvantage in understanding the record. *See, for example, Brooke et ux v. Amuchastequi et ux,* 226 Or 335, 360 P2d 275 (1961), and cases there cited and cases cited in the cited cases.

■ This all brings us to the rule that where the police operate without a warrant the state has the burden of proof (when relying upon a "consent search") that consent was voluntarily given. *State v. Douglas, supra.*[3] In attempting to meet that burden, district

---

[3]In *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366, 1370 (1971), this court said that the state's burden was to prove valid consent by "clear and convincing evidence." Whether that degree of probability, as defined in *Cook v. Michael,* 214 Or 513, 330 P2d 1026 (1958), is required we need not consider here. The writer of this opinion has discussed his disenchantment with the adjectives "clear and convincing" in several cases. *See, for*

attorneys would be well advised to keep in mind that appellate courts must know what the state's witnesses contend was actually said, in order for appellate courts to discharge their constitutional function in determining the validity of consent. We also believe that it is incumbent upon trial judges, in hearings upon motions to suppress of the kind here involved, to insist that counsel for both parties make a proper record. With respect to the trial judge's part therein, we do not yet direct this as a part of the trial judge's duty but merely seek to enlist the cooperation of trial judges in this respect. *Compare State v. Lakeside* (Denecke, C. J., dissenting), 277 Or 569, 589, 561 P2d 612 (1977).

## Street Encounters

It seems that there are three generally recognized categories of street encounters between policeman and citizen. In descending order of justification, they are: (1) arrest, justified only by probable cause; (2) temporary restraint of the citizen's liberty (a "stop"), justified by reasonable suspicion (or reliable indicia) of the citizen's criminal activity; and (3) questioning without any restraint of liberty (mere conversation), requiring no justification.[4]

We are initially concerned here with whether there was an unconstitutional seizure of the defendant that resulted in production of the evidence which is the subject of the motion to suppress. Seizure of a person includes arrest, investigatory detention, and any other detention of a person against his will. *See* Amsterdam,

*example, Byers v. Santiam Ford, Inc.* (Lent, J., specially concurring), 281 Or 411, 574 P2d 1122 (1978); and *Krueger v. Ropp* (Lent, J., concurring in part, dissenting in part), 282 Or 473, 579 P2d 847 (1978). We note here a question as to whether the burden should be either less, i.e., a preponderance of the evidence, or more, i.e., beyond a reasonable doubt.

[4] *Compare,* however, *People v. De Bour,* 40 NY2d 210, 352 NE2d 562, 386 NYS2d 375 (1976), which appears to fall somewhere in the continuum from neutral encounter to arrest, but exactly where it is difficult to say. *See* Comment, "Terry Revisited: Critical Update on Recent Stop-and-Frisk Developments," 1977 Wis LRev 877, 888. *Compare also,* Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn LRev 349, 376 (1974).

*Perspectives on the Fourth Amendment,* 58 Minn LRev 349, 357, (1974) where the author states:

> "* * * All that is required is that an 'officer, by means of physical force or *show of authority,* has in some way restrained the liberty of a citizen.' "

*See Terry v. Ohio, supra.*

In oral argument before this court, the state took the position that there was no detention of any kind of defendant prior to the time the Chief said "freeze." The state on argument further insisted that it was not relying upon "reasonable suspicion" prior to the time that the ammunition was placed on the hood of the police car. The state asserts that until that time this was merely a street encounter of the third kind; namely, "questioning without any restraint of liberty (mere conversation), requiring no justification." *See* text accompanying footnote 4, *supra.*

Before we decide whether this is a case of questioning without any restraint of liberty or a case of detention amounting to a "stop," it might be well to remind the bench and bar of some aspects of the exclusionary rule as it relates to the Fourth Amendment to the United States Constitution and Article I, Section 9, of the Oregon Constitution.[5] In speaking of criticisms of the exclusionary rule, Professor Yale Kamisar has directed our attention to salient considerations:

> "I think it may forcefully be argued that it is not the exclusionary rule which is illogical or misdirected, but much of the criticism it has generated. As Senator Robert Wagner pointed out in the 1938 New York State Constitution Convention:
>
> > " 'All the arguments [that the exclusionary rule will handicap law enforcement] seem to me to be properly directed not against the exclusionary rule but against the substantive guarantee itself * * * It

---

[5] For the purpose of this opinion, we assume, without deciding, that the Oregon constitutional provision affords at least as much protection against unreasonable seizure as does the Fourth/Fourteenth Amendments to the United States Constitution.

is the [law of search and seizure], not the sanction, which imposes limits on the operation of the police. If the rule is obeyed as it should be, and as we declare it should be, there will be no illegally obtained evidence to be excluded by the operation of the sanction.

" 'It seems to me inconsistent to challenge the exclusionary rule on the ground that it will hamper the police, while making no challenge to the fundamental rules to which the police are required to conform.'

"Cooley said of the Fourth Amendment 110 years ago that 'it is better oftentimes that crime should go unpunished than that the citizen should be liable to have his premises invaded, his trunks broken up, [or] his private books, papers, and letters exposed to prying curiosity.' Why is it no less true when the accused's premises *have been* invaded or his constitutional rights otherwise violated? If the government could not have gained a conviction had it obeyed the Constitution, why should it be permitted to prevail because it violated the Constitution? And why does it generate so much popular hostility to disallow the government to reap an advantage that it secured, and might only have been able to secure, by violating the Constitution?

"No one, I think, has given a better explanation than Professor John Kaplan, one of the sharpest critics of the rule:

" 'From a public relations point of view, [the exclusionary rule] is the worst possible kind of rule because it only works at the behest of a person, usually someone who is clearly guilty, who is attempting to prevent the use against himself of evidence of his own crimes * * * [But the] fact is that any rule which actually enforced the demands of the Fourth Amendment (whatever they may be) would prevent the conviction of those who would be caught through evidence obtained in violation of the Fourth Amendment. The problem with the exclusionary rule is that it works after the fact, so that by then we know who the criminal is, the evidence against him, and the other circumstances of the case. If there were some way to make the police obey, in advance, the commands of the Fourth Amendment, we would lose

at least as many criminal convictions as we do today, but in that case we would not know of the evidence which the police could discover only through a violation of the Fourth Amendment. It is possible that the real problem with the exclusionary rule is that it flaunts before us the price we pay for the Fourth Amendment.' "

(footnotes omitted) Y. Kamisar, "Is the Exclusionary Rule an 'Illogical' or 'Unnatural' Interpretation of the Fourth Amendment?", 62 Judicature 66, 73-74 (August 1978).

With these considerations in mind, we now attend to the relevant Oregon statutes. ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

For a definition of "stop," as used in ORS 131.615, *see* ORS 131.605(5), which provides:

"(5) A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

It is agreed by all concerned that these statutes are an attempt to codify an encounter of the second kind; namely, "temporary restraint of the citizen's liberty (a 'stop'), justified by reasonable suspicion (or reliable indicia) of the citizen's criminal activity." *See* text accompanying footnote 4, *supra.* In other words, the statutes are an attempted restatement of the rule of *Terry v. Ohio, supra,* and of *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969).

■ Given, therefore, the state's concession that there were no grounds for reasonable suspicion by Offficer Myers that the defendant had committed a crime at

[ 164 ]

the point of the encounter when Officer Myers "asked" the defendant to put his ID on a table near the door of the Homestead Tavern, it remains for us to determine whether this constituted a "stop." As further conceded by the state upon oral argument, there is "some show of authority" just by the fact of the officer's uniform. On direct examination following the time when defendant and Carlin placed their ID on the table:

"Q. Now, did you have any other conversation with them at that point in time?

"A. I advised them why I was doing this.

"Q. What did you tell them?

"A. I told them earlier in the evening we were advised of an armed robbery in Grants Pass and I would like to ask them about that.

"Q. Okay, and did you indicate to them what their status was; at that point in time were they under arrest?

"A. No, I did not.

"Q. Did they indicate anything about their status?

"A. I told them as soon as possible we would clear this matter up and they would be on their way.

"Q. Did either of the defendants indicate that they did not understand that in any manner?

"A. No, they didn't.

"Q. Did they indicate anything in that regard?

"A. They indicated a willingness to comply."[6]

We find in all the circumstances and in the exercise of our constitutional function that this constituted a seizure of the person of the defendant, in that there was a temporary restraint of his liberty by Myers, that there was no valid consent to this restraint, and, since it was not based upon reasonable suspicion on the part of Myers, that it was not authorized by ORS 131.615. Furthermore, it follows that this seizure is prohibited by the relevant provisions of both Oregon and United States Constitutions.

---

[6] Here again counsel failed to ascertain from the witness how defendant and Carlin "indicated a willingness to comply." Counsel adduced from the witness neither the words nor the gestures from which *Myers drew a conclusion* of compliance.

By his own testimony, Officer Myers made it clear that he no longer had any suspicion predicated upon Carlin's possession of a large amount of money and that from that point on he was on a "fishing expedition."

Since the state concedes that there was no ground of reasonable suspicion that defendant or Carlin had committed a crime prior to the appearance of the ammunition on the hood of the automobile,[7] we now address Chief Hinrich's "request" that defendant and Carlin empty their pockets on the hood of the police car. Keeping in mind the number of police officers and police cars then present, we find that there was no valid consent to this "request" by the Chief.

It follows that the evidence obtained from that point forward is tainted by the illegal seizure of the defendant's person and by the illegal search and seizure of the contents of his pockets, and therefore must be suppressed. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *Wong Sun v. United States,* 371 US 471, 9 L ed2d 441, 83 S Ct 407 (1963).

Reversed and remanded.

**TONGUE, J.,** concurring.

I reluctantly concur, but only for the reason that a minority of this court "fought and lost the battle" in a recent case involving similar facts. *See State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977) (Tongue, J., dissenting).

Howell, J., joins in this concurring opinion.

---

[7] Although it is not necessary to our decision, given this concession and our finding that this was a "stop," we note that Officer Myers' own testimony shows that he continued his inquiry beyond "the immediate circumstances that aroused" his suspicion; i.e., the wad of bills.