GRABER, J.,
dissenting.
I dissent.
I. WHAT HAPPENED?
The trial court found:
“Officer Willard responded to a call * * * [about] a man waving a gun, coming out of the house. * * * He went to station himself on the northeast corner of defendant’s property. Officer Kahut arrived along with other officers and they asked defendant to come out of the house. He was out of the house when she first arrived and he went back into the house. She asked him to come out and that’s when calls [came] from the dispatcher trying to convince the defendant to come out of his house with his hands up in the air.”
The trial court also found:
“[Defendant] wasn’t forced out of the house. They didn’t drag him out of there. They told him to come out of there, and he didn’t have to come. He could have stayed in that house.”
*211 The record supports those findings, which means that this court is bound by them. Ball v. Gladden, 250 Or 485, 487, 443 P2d 621 (1968).
The majority overstates the severity of the actions taken by the police. According to the trial court, the police “asked,” “tr[ied] to convince,” and “told” defendant to come out of the house.[1] According to the majority, the police “ordered” defendant to come out of the house. 323 Or at 202. The word “order” implies police compulsion and coercion; yet, the trial court repeatedly used words that contain no such implication. That distinction between the trial court’s factual findings and the majority’s treatment of the facts is significant, because the trial court’s actual findings of historical fact support the trial court’s explicit conclusion that defendant voluntarily left his house. The trial court would not have reached that conclusion had it thought that the police had intimidated defendant into leaving his house.
II. WHAT DID THE POLICE “SEIZE”?[2]
The proper legal analysis in this case begins by recognizing that, for the purposes of Article I, section 9, of the Oregon Constitution,[3] this court has drawn a distinction between unreasonable seizures of the home and unreasonable seizures of the person. In the absence of a search warrant, a police officer may not seize a home unless circumstances exist that would permit a warrantless search of the property: probable cause and exigent circumstances. See State v. Matsen/Wilson, 287 Or 581, 589, 601 P2d 784 (1979) (holding that seizing a home “prior to arrests and without a warrant is not lawful absent unforseen and compelling circumstances which would independently justify a warrantless entry and search”). However, the police may seize a person temporarily even in the absence of probable cause. See State v. Warner, *212 284 Or 147, 161, 585 P2d 681 (1978) (stating that one “recognized category of street encou'nter[] between policeman and citizen” is a “temporary restraint of the citizen’s liberty (a ‘stop’), justified by reasonable suspicion (or reliable indicia) of the citizen’s activity”); see also State v. Holmes, 311 Or 400, 407, 813 P2d 28 (1991) (“a ‘seizure’ of a person occurs when a police officer temporarily restrains a person’s liberty * * * justified by reasonable suspicion of the citizen’s criminal activity”).
The majority concludes that the police needed probable cause and exigent circumstances to seize defendant, because the seizure of defendant occurred in defendant’s house. 323 Or at 208-09. But, seizing a person and seizing a home are different acts. A seizure of a person occurs under Article I, section 9:
“(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual’s liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances.”Holmes, 311 Or at 409-10.
A seizure of property occurs “when there is a significant interference with a person’s possessory or ownership interests in property.” State v. Owens, 302 Or 196, 207, 729 P2d 524 (1986).
Defendant does not argue that his home was seized. Defendant does not argue that the actions of the police in this case interfered with any possessory or ownership interest in his property. Nor would the facts in this case support such an argument. Defendant argues only that his person was improperly seized. A discussion about whether defendant’s house was seized is not relevant to a determination of whether defendant’s person was seized. Accordingly, the majority’s conclusion that the only applicable standard in this case is the “probable cause/exigent circumstances” standard applicable to seizures of property is erroneous.
Inducing a person to come out of a house is not the equivalent of going into the house. In the former situation, the police do not intrude on the privacy interests of the residence. A telephone call — even one “ordering” a person to *213 leave — is not an entry into the house. What the police here seized was defendant, not the house.
III. WHEN DID THE POLICE SEIZE DEFENDANT?
The majority holds that defendant “had been seized while in the house, before he came out of his house with his hands up in response to the police order.” 323 Or at 207. See Holmes, 311 Or at 408 (“the determination of whether a person has been seized under Article I, section 9, and, if so, at what point in the encounter, will require a fact specific inquiry into the totality of the circumstances of the particular case”).
In my view, however, defendant was seized when he stepped out of his house onto the porch. That is when he complied with the request of the police to come out of his house. In Holmes, the court discussed the “three categories of encounters along the continuum of meetings between law enforcement officers and citizens”:
“First, a police-citizen encounter without any restraint of liberty (e.g., mere conversation, a non-coercive encounter) is not a ‘seizure5 and, therefore, requires no justification. Second, a ‘seizure5 of a person occurs when a police officer temporarily retrains a person’s liberty (a ‘stop’ under ORS 131.605(5)), justified by reasonable suspicion of the citizen’s criminal activity. Third, a seizure of a person occurs upon an arrest, justified by probable cause to believe that the person arrested has committed a crime.” Id. at 407 (citations omitted; footnotes omitted).
Not every encounter between the police and a citizen is a “seizure” under Article I, section 9; rather, a seizure of a person occurs either when law enforcement officials “intentionally and significantly restrict” an individual’s liberty or freedom of movement, or when an individual reasonably believes that such a restriction has occurred. Id. at 409-10. In this case, defendant’s liberty was not “significantly” restricted, nor did defendant appear to believe that it was, until he left his house.
This court’s prior cases provide some guidance in deciding when the police seized defendant. In State v. Gerrish, 311 Or 506, 518, 815 P2d 1244 (1991), the court reversed a trial court’s grant of a suppression motion to a defendant *214 who argued that he had been seized improperly by the police. In that case, a police officer responded to a call concerning an armed robbery. The officer took up a position at the only roadway leading away from the location where the robbery occurred. The officer had his flashing overhead lights on when the defendant’s car drove by without stopping. The officer “commanded” the defendant to stop, which he did. The officer asked the defendant if he knew anything about the robbery. In the course of questioning the defendant, the officer made observations that gave him probable cause to believe that the defendant was driving under the influence of intoxicants (DUII). Defendant was arrested for DUII. Id. at 508-09. Applying Holmes, the court concluded that the officer had not seized the defendant until after the officer made the observations that gave rise to probable cause to believe that that defendant was driving while intoxicated. Id. at 513.
Holmes involved similar facts. In Holmes, a deputy sheriff had set up a detour at one side of a bridge to reroute traffic around the scene of an accident. The officer had placed flares on the highway and had turned on the overhead lights on his patrol car. He was in uniform, holding a flashlight and directing traffic. The defendant, who was driving his car, approached the deputy and stopped at a point two or three feet beyond where the deputy indicated that the defendant should stop. As the deputy approached the defendant’s car, the car rolled forward another two to three feet. The defendant rolled down his window, and the deputy spoke with the defendant, explaining that, because of the accident, the defendant would have to take the detour. When the defendant responded, the deputy made observations that gave rise to probable cause to believe that the defendant was intoxicated. The defendant performed field sobriety tests and was arrested for DUII. 311 Or at 403. The court held that defendant was not. seized until after probable cause existed. “The officer’s initial encounter with defendant in stopping his vehicle and imparting information did not significantly restrict, interfere with, or otherwise deprive defendant of his liberty or freedom of movement.” Id. at 411 (emphasis original).
Both Gerrish and Holmes stand for the proposition that a law enforcement officer may temporarily prevent an *215 individual from passing through a public area without “seizing” that person.
Two other cases from this court—Warner and State v. Painter, 296 Or 422, 676 P2d 309 (1984)—also are informative. See Holmes, 311 Or at 408 (“[b]oth Warner and Painter illustrate the distinction between an encounter that intrudes upon no constitutionally protected interest and an intrusion amounting to a ‘seizure’ of the person”). In Warner, two police officers received a report about an armed robbery in which two men were involved. Soon after receiving that report, the officers saw the defendants getting out of a car and entering a bar. The officers waited outside the bar for 10 minutes and then decided to enter the bar for a “routine check.” One of the officers exchanged a few words with one of the defendants and then asked the bartender if he had seen any suspicious activity. The bartender told one of the officers that one of the defendants had “just pulled out a wad of money, the size he’d never seen before.” That officer was outside when the defendants walked out the front door of the bar. The officer stopped the defendants and asked them to go back into the bar. The defendants did as the officer asked. When they were all inside the bar, the officer asked the defendants to remove their wallets, take out identification, and place the identification on a table. The defendants complied. Warner, 284 Or at 149-52. The defendants eventually were arrested and charged with robbery. This court held that the officer had seized the defendants only when the officer asked the defendants to place their identification on the table. Id. at 165.[4]
In Painter, a deputy was on patrol looking for “suspicious people.” He saw the defendant walking in an alley at 3:00 a.m. and asked him what he was doing. The defendant said that he had car trouble and was going to find a telephone. The officer asked the defendant for identification, and the defendant produced, among other things, an expired driver license. The officer retained the identification. The officer patted down the defendant and ran a radio check, *216 which came back clear. The officer then asked the defendant for the make and location of his car. After the defendant answered the officer’s questions, the officer returned the defendant’s identification to him and left. The officer then located the defendant’s car and, through the window, saw what he suspected was a pistol under the driver’s seat. The officer waited until the defendant returned to the car and drove away. The officer then stopped defendant for driving while suspended and for carrying a concealed weapon. Painter, 296 Or at 424-25. The court held that the officer seized the defendant when he retained the defendant’s identification because, at that point, defendant was “unable to leave.” Id. at 425.
Warner and Painter illustrate the extent to which an officer may act before the officer’s conduct becomes a seizure. In Warner, no seizure occurred until the officers took possession of a piece of the defendants’ property. The police entered the bar in which the defendants sat, spoke with the defendants, and asked the defendants to return to the bar, all without “significantly depriv[ing]” the defendants of their liberty or freedom of movement. Similarly, in Painter, no seizure occurred when the officer stopped the defendant in the alley and asked him what he was doing.
In the light of this court’s holdings in Gerrish, Holmes, Painter, and Warner, I am unable to conclude that the facts in this case support a conclusion that the police seized defendant while defendant was inside his house. The police barricaded the street on which defendant’s house is located. Gerrish and Dahl show that the police may do that without creating circumstances that give rise to a seizure. Officer Kahut, who was standing on the street, sought to speak with defendant. Again, that fact does not give rise to a seizure. Officer Kahut and the two other officers then remained on the street. The officers were not brandishing their weapons, nor are there any facts in the record suggesting that the officers intended to enter defendant’s house. Similarly, there are no facts in the record from which a finder of fact could conclude that the officers intended to restrain defendant’s liberty while defendant was in the house.
*217 The only fact that reasonably could support the majority’s conclusion that defendant was seized while inside his house is that the dispatcher telephoned defendant and told him to come out of the house with his hands raised. That call, in itself, does not rise to the level of a seizure. In fact, the telephone call, in the absence of the physical presence of the police officers in defendant’s house, is less of a restriction on defendant’s liberty than was the police conduct in Warner, when the officer standing near the defendants asked that the defendants return to the bar. Similarly, the officer’s conduct in Painter, when the officer approached and questioned the defendant in an alley, was a greater restriction on liberty than the telephone call and waiting police officers here.
The facts in this case also do not support a conclusion that defendant believed that the conduct of the police, before he left his house, was a significant restraint on his liberty. Before receiving the telephone call, defendant conducted himself in a manner suggesting that he did not believe that his liberty was being restricted.[5] After he received the telephone call, he remained in his house for 10 minutes. That action supports an inference that defendant did not feel that the call, when made, constituted a significant restraint on his liberty. That restraint occurred only when defendant complied with the order (even assuming that it was an “order”) and left the house.
*218 IV. WHAT WAS THE NATURE OF THE SEIZURE OF DEFENDANT?
I agree with the majority’s conclusion that, when defendant came out of his house onto the porch, he was seized. I also agree that the officers lacked probable cause to arrest defendant at that moment. However, those conclusions do not mean that the evidence gathered as a result of that seizure necessarily must be suppressed. When the officers had seized defendant, they may have had a reasonable suspicion that defendant had committed a Class A misdemeanor. A citizen’s call to the police that a man was waving a gun and coming out of a house could have given the police a reasonable suspicion that defendant was committing the misdemeanor of menacing[6] or recklessly endangering another person.[7] If they had such a reasonable suspicion, then the officers’ initial seizure of defendant on the porch was a lawful “stop” of defendant. See ORS 131.605 to 131.615 (providing circumstances under which a police officer may stop a person who the officer “reasonably suspects” may have committed a crime); see also State v. Cloman, 254 Or 1, 6, 456 P2d 67 (1969) (establishing that police may “stop” an individual and temporarily detain that individual based on a “reasonable suspicion” that that individual has committed a crime; “[t]his ‘reasonable suspicion’ we deem to be of less quantum than probable cause to arrest”).
Soon after the officers seized defendant, they made observations that gave them probable cause to believe that defendant had been driving while intoxicated. The restraint on defendant’s liberty between the time the officers seized defendant on his porch and the time the officers made the observations that gave them probable cause to believe that *219 defendant had been driving under the influence of intoxicants was minimal. The officers noticed almost immediately after the seizure of defendant that he was swaying when he walked. They realized that defendant recently had been driving. They spoke with defendant, and he smelled strongly of alcohol. Those facts justified an arrest of defendant, because they gave rise to probable cause that defendant had committed the crime of DUII. Accordingly, if the officers had a reasonable suspicion that defendant had committed a crime when they seized him, the facts that gave rise to probable cause that defendant had committed the crime arose when the police lawfully were investigating that suspicion. Under those circumstances, the seizure of defendant would have been lawful, and the evidence need not be suppressed. If, on the other hand, the officers did not have a reasonable suspicion that defendant had committed a crime when they seized him on the porch, that seizure would have violated Article I, section 9, and suppression would be required.
The trial court did not make findings concerning whether the officers were investigating a reasonable suspicion that defendant had committed a crime. Accordingly, I would remand this case to the trial court for further findings.
The majority fails to discuss the nature of the seizure of defendant in this case. The majority explicitly acknowledges that, in Holmes, this court recognized that both “stops” and “arrests” are seizures requiring different levels of justification for police action. Yet, the majority never explains why the initial seizure in this case is an “arrest” rather than a “stop” under Holmes. By measuring the police actions against the standard of probable cause, the majority implicitly — but without explanation — appears to conclude that the police arrested defendant when the police first seized him. That conclusion is, in my view, unwarranted in view of this court’s prior cases.
For the foregoing reasons, I respectfully dissent.

 In defendant’s brief to the Court of Appeals, he wrote that the police dispatcher called him and “told” him to come outside with his hands up.

 I reach the constitutional issues, because there is no potential subconstitutional basis for decision. In that regard, I note that the majority’s discussion of various statutes, 323 Or at 204-05, appears to serve no function.

 Article I, section 9, of the Oregon Constitution, provides in part:
“No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * *

 In Warner, the state conceded that the officers lacked a reasonable suspicion that the defendants had committed the crimes when they were seized. 284 Or at 166. Accordingly, the court had no occasion to decide whether the “seizure” of defendants was a “stop” or an “arrest.”

 Defendant summarizes the facts leading to his arrest as follows:
“[Defendant] * * * had been at a local tavern where he drank beer and shot pool from approximately 4:00 to 7:00 p.m. He drank three pints of beer during that three hour period but did not become intoxicated from it. He then walked home which was just a few blocks from the tavern.
“[Defendant] went into his house and busied himself recording music on cassette tapes. Sometime later he noticed that police were gathering at either end of his block. When he saw the police barricading the street he decided to move his car to safety by driving it around the block and into his driveway. Once back in his house he drank several shots of tequila and some beer. Sometime later he heard the police shouting outside. He looked outside to see what the problem was. One of the officers yelled for him to get off the porch. Upon hearing this, he went back inside his house and shut the door.”
Before receiving the telephone call, defendant acted in a manner that showed that he did not believe that he was restrained by the police. When he saw the police arrive on his street, he left, and returned to, his house. He remained in his house and drank. He looked out to see what was going on in the street and then returned to his house.

 ORS 163.190 provides:
“(1) A person, commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury.
“(2) Menacing is a Class A misdemeanor.”

 ORS 163.195 provides:
“(1) A person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.
“(2) Recklessly endangering another person is a Class A misdemeanor.”