915 P.2d 979 (1996)
323 Or. 199
STATE of Oregon, Respondent on Review,
v.
Douglas DAHL, Petitioner on review.
DC Z157060; CA A83202; SC S41948.
Supreme Court of Oregon, In Banc.
Argued and Submitted January 5, 1996.
Decided May 9, 1996.
*981 Paul L. Breed, Portland, argued the cause and filed briefs on behalf of petitioner on review.
Douglas F. Zier, Assistant Attorney General, argued the cause on behalf of respondent on review. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.
UNIS, Justice.
The questions in this case are (1) whether a "seizure" of a person occurs under either Article I, section 9, of the Oregon Constitution[1] or the Fourth Amendment to the Constitution of the United States[2] when law enforcement officers order a person to come out of his house with his hands up and the person to whom the order is directed complies with that order and, (2) if so, whether, in the light of the circumstances of this case, a seizure of that kind was unlawful. We answer those questions in the affirmative. We therefore reverse the contrary decision of the Court of Appeals, vacate the judgment of the district court, and remand this case to the district court for further proceedings.
On September 3, 1993, Portland police officers responded to a report from an anonymous telephone caller that there was a "man waving a gun on the front porch" at a specified address.[3] The officers arrived at that *982 location, barricaded the streets, and surrounded the house.
As Officer Willard arrived at the scene, he observed defendant driving a car and making a wild swerve over the left side of the street. Willard shined his flashlight at defendant and saw that defendant had a "dazed look," that he was slumped behind the wheel, and that he did not respond to the light. Although he suspected that defendant was under the influence of intoxicants, Willard did not stop or pursue defendant. Willard stationed himself at the northeast corner of the house. He then saw defendant drive around the corner and into the driveway. Officers Hoesley (the officer in charge) and Kahut, along with several other officers, arrived at the scene. Willard told Hoesley that he had observed defendant driving around the block, but he did not tell Hoesley, Kahut, or any of the other officers at the scene about his other observations about defendant or that he suspected defendant to be under the influence of intoxicants.
When Kahut saw defendant come out of the house onto the front porch, she shouted for him to come down "with his hands up." Instead, defendant went back into the house and shut the door. At Kahut's request, a police dispatcher then telephoned defendant and ordered him[4] to come out of the house with his hands up. Defendant complied with that order. When defendant emerged from the house, the officers perceived that his eyes were bloodshot, that his speech was slurred, that he had a "swaying walk," and that he smelled of alcohol. On questioning, defendant admitted that he had driven his car earlier in the evening. Defendant was searched. After Hoesley searched defendant's house, including the basement, she transported him to the police station where, after she administered field sobriety and breath tests, defendant was charged with driving under the influence of intoxicants (DUII), ORS 813.010.
Before trial, relying on both Article I, section 9, of the Oregon Constitution and the Fourth Amendment, defendant moved to suppress all the evidence derived from his compliance with the order to come out of the house, including the officer's observations of his intoxication, his statement that he had been driving earlier in the evening, and the results of the field sobriety and breath alcohol tests. In support of his motion, defendant argued that he was seized unlawfully, without a warrant, inside his house when he complied with the police order to come out "with his hands up."
ORS 131.005(11) provides that "`[p]robable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." Under Article I, section 9, of the Oregon Constitution, there are two components to probable cause: "An officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure, and this belief must be objectively reasonable in the circumstances." State v. Owens, 302 Or. 196, 204, 729 P.2d 524 (1986). The state conceded that the officers did not have probable cause to believe that defendant had committed a crime until after defendant emerged from his house in compliance with the "come-out-with-your-hands-up" order. Nevertheless, the state argued *983 that defendant was not "seized" until the police had probable cause to arrest him by observing him after he came out of his house.
The trial court found that, when defendant complied with the order to come out of his house "with his hands up," he was "taken in[to] custody which for all purposes is an arrest" and that defendant "was not free to go * * * [un]til [the police] secured the house." Nonetheless, the trial court denied defendant's motion to suppress, reasoning:
"[Defendant] wasn't forced out of the house. They didn't drag him out of there. They told him to come out of there, and he didn't have to come. He could have stayed in that house. And they never could have gone in that house. Never. Because they had no reason to go in the house. None whatsoever. * * * The arrest was legal."
After a jury trial, in which the challenged evidence was received in the state's case-in-chief, defendant was convicted of DUII and sentenced. Defendant appealed his conviction to the Court of Appeals, assigning as error the trial court's denial of his motion to suppress. The Court of Appeals affirmed defendant's conviction without opinion. State v. Dahl, 132 Or.App. 232, 888 P.2d 606 (1994). We allowed defendant's petition for review.
Before addressing defendant's state and federal constitutional claims, we first decide whether the police officers acted lawfully under proper authorization by a politically accountable lawmaker. State v. Holmes, 311 Or. 400, 404, 813 P.2d 28 (1991).
A peace officer has statutory authority to make a warrantless arrest of a person if the officer has probable cause to believe that the person has committed a felony, a Class A misdemeanor, the offense of DUII under ORS 813.010, or certain other offenses. ORS 133.310(1). Peace officers also are authorized by ORS 133.033(1) "to perform community caretaking functions." "`[C]ommunity caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public." ORS 133.033(2) (emphasis added). As used in ORS 133.005 and 133.310, "peace officer" includes a municipal police officer. ORS 133.033(2) provides:
"`Community caretaking functions' includes, but is not limited to:
"(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:
"(A) Prevent serious harm to any person or property;
"(B) Render aid to injured or ill persons; or
"(C) Locate missing persons.
"(b) The right to stop or redirect traffic or aid motorists or other persons when such action reasonably appears to be necessary to:
"(A) Prevent serious harm to any person or property;
"(B) Render aid to injured or ill persons; or
"(C) Locate missing persons."
ORS 133.033(3) provides:
"Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law."[5]
The quoted statutes do not provide a comprehensive definition of what constitutes "lawful acts." Attempting an essay on that topic would take us afield needlessly. Whatever the meaning of "lawful acts" in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions. Therefore, we assess the effect of Kahut's telephoned order for defendant to "come out of his house with his hands up" and defendant's compliance with that order within the parameters of the state and federal constitutions.
*984 We first consider defendant's assertions under Article I, section 9, of the Oregon Constitution. See State v. Kennedy, 295 Or. 260, 262, 666 P.2d 1316 (1983) (stating methodology). In our review, we are bound by the trial court's findings of historical facts if there is evidence in the record to support them. State v. Bost, 317 Or. 538, 541, 857 P.2d 132 (1993). Our function is limited to determining whether legal principles were correctly applied. State v. Davis, 295 Or. 227, 238, 666 P.2d 802 (1983).
Article I, section 9, of the Oregon Constitution prohibits police officers from conducting unreasonable searches and seizures. State v. Gerrish, 311 Or. 506, 510, 815 P.2d 1244 (1991). Relying on that constitutional provision, defendant asserts that he was unlawfully seized inside his house. The first issue in an Article I, section 9, seizure analysis is whether the conduct of the police constituted a "seizure" in the constitutional sense. Id. In this case, that approach requires us to determine whether defendant's compliance with the officer's order to "come out of his house with his hands up" was a seizure of defendant.
Given the diversity in the possible kinds of encounters between police and citizens, we have been cautious in defining the limits imposed by Article I, section 9, on such encounters. This court previously has identified three distinct categories of police-citizen encounters along the continuum of meetings between police and citizens and has indicated whether those encounters constitute a "seizure" of a person under Article I, section 9, of the Oregon Constitution. First, a police-citizen encounter without any restraint of liberty (e.g., mere conversation, a noncoercive encounter) is not a "seizure" within the meaning of Article I, section 9, and, therefore, requires no justification. Holmes, 311 Or. at 407, 813 P.2d 28 (citing State v. Warner, 284 Or. 147, 161, 585 P.2d 681 (1978)). Second, a "seizure" of a person occurs when a police officer temporarily restrains a person's liberty (a "stop" under ORS 131.605(5)), but such a seizure is so limited in scope and duration that it may be justified by reasonable suspicion of the citizen's criminal activity.[6]Holmes, 311 Or. at 407, 813 P.2d 28 (citing State v. Kennedy, 290 Or. 493, 498, 624 P.2d 99 (1981), and Warner, 284 Or. at 161, 585 P.2d 681). Third, a "seizure" of a person occurs on an arrest, justified by probable cause to believe that the person has committed a crime. Holmes, 311 Or. at 407, 813 P.2d 28. "The[se] three categories are guidelines only. They are neither exhaustive nor conclusive as to what police action is a `seizure' of a person." Id.
In Holmes, 311 Or. at 409-10, 813 P.2d 28, this court synthesized the holdings of this court's prior cases to provide the following test for determining whether a person has been seized for purposes of Article I, section 9:
"[A] `seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."
The determination of whether a police-citizen encounter is a "seizure" within the meaning of Article I, section 9, "is a fact-specific inquiry into the totality of the circumstances." Id. at 408, 813 P.2d 28.
"[An] encounter is a `seizure' of a person only if the
officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself [or herself] in a manner that would be perceived as nonoffensive contact if it had occurred between two ordinary citizens." Id. at 410, 813 P.2d 28.
An application of the foregoing principles in this case compels the conclusion that defendant was "seized" within the meaning of Article I, section 9, of the Oregon Constitution. *985 We need not decide the precise moment at which defendant was seized. It is sufficient to state that he had been seized while in the house, before he came out of his house with his hands up in response to the police order. The police order to defendant was not a request. Rather, it conveyed a message that compliance was required. The order was intended to and did result in a significant restriction of defendant's liberty or freedom of movement. The encounter between the officers and defendant cannot fairly be characterized as voluntary or consensual; rather, it was confrontational and coercive. The officers engaged in conduct that, in effect, deprived defendant of any choice in the matter. The police had, in effect, announced to defendant that (1) he was not at liberty to go about his business and ignore their order to come out his house "with his hands up," and (2) he did not have the right to refuse to comply with that order.
In the encounter with defendant, the police engaged in conduct significantly beyond that accepted in ordinary social intercourse. Stated differently, the police engaged in conduct that would be perceived as an offensive contact if it had occurred between two ordinary citizens. Defendant's submission to such a show of force and assertion of authority significantly restricted, interfered with, or otherwise deprived him of his liberty or freedom. Moreover, in light of the surrounding circumstances, defendant's submission to such a show of force and assertion of authority is evidence that he reasonably believed that his liberty or freedom was intentionally and significantly restricted, interfered with, or otherwise deprived, and the facts that we have recited demonstrate that such belief was objectively reasonable in the circumstances. Accordingly, within the meaning of Article I, section 9, of the Oregon Constitution, a seizure of defendant's person occurred while he still was in his house, and when defendant commenced to comply with the police order.
We now turn to the question whether that seizure was lawful. In this case, the police did not have a warrant to seize defendant. Nor, as the state concedes, did the police have probable cause to arrest defendant until after he emerged from his house in compliance with the "come-out-of-your-house-with-your-hands-up" order. Moreover, the state conceded at oral argument that there were no exigent circumstances[7] to justify a warrantless seizure of defendant inside his house or entry into defendant's house to seize him, and none appear from the record. Indeed, the trial court found that the officers "had no reason to go in [defendant's] house."
The burden is on the state to establish by a preponderance of the evidence that the warrantless seizure of defendant's person was reasonable under an exception to the warrant requirement. State v. Olson, 287 Or. 157, 165, 598 P.2d 670 (1979). See also ORS 133.693(4) ("[w]here the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution").
A well-established, constitutional principle is that, where there is neither "hot pursuit" nor any other pre-existing, exigent circumstances, police officers with probable cause to arrest a suspect may not make a warrantless and nonconsensual entry into a suspect's house in order to make a routine felony arrest of the suspect. See Olson, 287 Or. at 165, 598 P.2d 670 (stating that principle under Article I, section 9, of the Oregon Constitution and holding that the application of ORS 133.235(5)[8] would be an unconstitutional application where there are no exigent circumstances);[9]Payton v. New York, 445 *986 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (stating same principle under Fourth Amendment to the Constitution of the United States). In such circumstances, an arrest warrant, based on probable cause, is constitutionally required.[10]Olson, 287 Or. at 165, 598 P.2d 670. Permitting the police, without a warrant based on probable cause or probable cause plus exigent circumstances, to seize a person inside his house by ordering that person to emerge from his house would be inconsistent with that well-established constitutional principle. See Olson, 287 Or. at 164-65, 598 P.2d 670 (stating principle).
We recognize that the police had been told that an occupant of the house had a gun. We also are mindful of the dangers inherent in the work of police officers. The potential for violence exists in all confrontations between police and private citizens. However, the mere fact that a person is seen waving a gun on the front porch of a house, standing alone, is not an indicator of criminal activity. The anonymous telephone call appropriately triggered police investigation, but no legitimate part of that investigation ever ripened into either a warrant based on probable cause to believe that defendant had committed a crime or such probable cause plus exigent circumstances. The seizure of defendant was unlawful. All of the evidence against defendant in this case was derived from that seizure.
Having determined that defendant was unlawfully seized, it follows that all the evidence obtained by the officers following defendant's emergence from his home must be suppressed as the fruits of that unlawful seizure.[11]
The decision of the Court of Appeals and the judgment of the district court are reversed. This case is remanded to the district court for further proceedings.
GRABER, J., dissented and filed an opinion.
GRABER, Justice, dissenting.
I dissent.

I. WHAT HAPPENED?
The trial court found:
"Officer Willard responded to a call * * * [about] a man waving a gun, coming out of the house. * * * He went to station himself on the northeast corner of defendant's property. Officer Kahut arrived along with other officers and they asked defendant to come out of the house. He was out of the house when she first arrived and he went back into the house. She asked him to come out and that's when calls [came] from the dispatcher trying to convince the defendant to come out of his house with his hands up in the air."
The trial court also found:
"[Defendant] wasn't forced out of the house. They didn't drag him out of there. They told him to come out of there, and he didn't have to come. He could have stayed in that house."
The record supports those findings, which means that this court is bound by them. Ball v. Gladden, 250 Or. 485, 487, 443 P.2d 621 (1968).
The majority overstates the severity of the actions taken by the police. According to the trial court, the police "asked," "tr[ied] to convince," and "told" defendant to come out of the house.[1] According to the majority, the *987 police "ordered" defendant to come out of the house. 323 Or. at ___, 915 P.2d at 982). The word "order" implies police compulsion and coercion; yet, the trial court repeatedly used words that contain no such implication. That distinction between the trial court's factual findings and the majority's treatment of the facts is significant, because the trial court's actual findings of historical fact support the trial court's explicit conclusion that defendant voluntarily left his house. The trial court would not have reached that conclusion had it thought that the police had intimidated defendant into leaving his house.

II. WHAT DID THE POLICE "SEIZE"?[2]
The proper legal analysis in this case begins by recognizing that, for the purposes of Article I, section 9, of the Oregon Constitution,[3] this court has drawn a distinction between unreasonable seizures of the home and unreasonable seizures of the person. In the absence of a search warrant, a police officer may not seize a home unless circumstances exist that would permit a warrantless search of the property: probable cause and exigent circumstances. See State v. Matsen/Wilson, 287 Or. 581, 589, 601 P.2d 784 (1979) (holding that seizing a home "prior to arrests and without a warrant is not lawful absent unforseen and compelling circumstances which would independently justify a warrantless entry and search"). However, the police may seize a person temporarily even in the absence of probable cause. See State v. Warner, 284 Or. 147, 161, 585 P.2d 681 (1978) (stating that one "recognized category of street encounter[ ] between policeman and citizen" is a "temporary restraint of the citizen's liberty (a `stop'), justified by reasonable suspicion (or reliable indicia) of the citizen's activity"); see also State v. Holmes, 311 Or. 400, 407, 813 P.2d 28 (1991) ("a `seizure' of a person occurs when a police officer temporarily restrains a person's liberty * * * justified by reasonable suspicion of the citizen's criminal activity").
The majority concludes that the police needed probable cause and exigent circumstances to seize defendant, because the seizure of defendant occurred in defendant's house. 323 Or. at ___, 915 P.2d at 985-86. But, seizing a person and seizing a home are different acts. A seizure of a person occurs under Article I, section 9:
"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." Holmes, 311 Or. at 409-10, 813 P.2d 28.
A seizure of property occurs "when there is a significant interference with a person's possessory or ownership interests in property." State v. Owens, 302 Or. 196, 207, 729 P.2d 524 (1986).
Defendant does not argue that his home was seized. Defendant does not argue that the actions of the police in this case interfered with any possessory or ownership interest in his property. Nor would the facts in this case support such an argument. Defendant argues only that his person was improperly seized. A discussion about whether defendant's house was seized is not relevant to a determination of whether defendant's person was seized. Accordingly, the majority's conclusion that the only applicable standard in this case is the "probable cause/exigent circumstances" standard applicable to seizures of property is erroneous.
Inducing a person to come out of a house is not the equivalent of going into the house. In the former situation, the police do not intrude on the privacy interests of the residence. A telephone calleven one "ordering" a person to leaveis not an entry *988 into the house. What the police here seized was defendant, not the house.

III. WHEN DID THE POLICE SEIZE DEFENDANT?
The majority holds that defendant "had been seized while in the house, before he came out of his house with his hands up in response to the police order." 323 Or. at 207, 915 P.2d at 985. See Holmes, 311 Or. at 408, 813 P.2d 28 ("the determination of whether a person has been seized under Article I, section 9, and, if so, at what point in the encounter, will require a fact specific inquiry into the totality of the circumstances of the particular case").
In my view, however, defendant was seized when he stepped out of his house onto the porch. That is when he complied with the request of the police to come out of his house. In Holmes, the court discussed the "three categories of encounters along the continuum of meetings between law enforcement officers and citizens":
"First, a police-citizen encounter without any restraint of liberty (e.g., mere conversation, a noncoercive encounter) is not a `seizure' and, therefore, requires no justification. Second, a `seizure' of a person occurs when a police officer temporarily restrains a person's liberty (a `stop' under ORS 131.605(5)), justified by reasonable suspicion of the citizen's criminal activity. Third, a seizure of a person occurs upon an arrest, justified by probable cause to believe that the person arrested has committed a crime." Id. at 407, 813 P.2d 28 (citations omitted; footnotes omitted).
Not every encounter between the police and a citizen is a "seizure" under Article I, section 9; rather, a seizure of a person occurs either when law enforcement officials "intentionally and significantly restrict" an individual's liberty or freedom of movement, or when an individual reasonably believes that such a restriction has occurred. Id. at 409-10, 813 P.2d 28. In this case, defendant's liberty was not "significantly" restricted, nor did defendant appear to believe that it was, until he left his house.
This court's prior cases provide some guidance in deciding when the police seized defendant. In State v. Gerrish, 311 Or. 506, 518, 815 P.2d 1244 (1991), the court reversed a trial court's grant of a suppression motion to a defendant who argued that he had been seized improperly by the police. In that case, a police officer responded to a call concerning an armed robbery. The officer took up a position at the only roadway leading away from the location where the robbery occurred. The officer had his flashing overhead lights on when the defendant's car drove by without stopping. The officer "commanded" the defendant to stop, which he did. The officer asked the defendant if he knew anything about the robbery. In the course of questioning the defendant, the officer made observations that gave him probable cause to believe that the defendant was driving under the influence of intoxicants (DUII). Defendant was arrested for DUII. Id. at 508-09, 815 P.2d 1244. Applying Holmes, the court concluded that the officer had not seized the defendant until after the officer made the observations that gave rise to probable cause to believe that that defendant was driving while intoxicated. Id. at 513, 815 P.2d 1244.
Holmes involved similar facts. In Holmes, a deputy sheriff had set up a detour at one side of a bridge to reroute traffic around the scene of an accident. The officer had placed flares on the highway and had turned on the overhead lights on his patrol car. He was in uniform, holding a flashlight and directing traffic. The defendant, who was driving his car, approached the deputy and stopped at a point two or three feet beyond where the deputy indicated that the defendant should stop. As the deputy approached the defendant's car, the car rolled forward another two to three feet. The defendant rolled down his window, and the deputy spoke with the defendant, explaining that, because of the accident, the defendant would have to take the detour. When the defendant responded, the deputy made observations that gave rise to probable cause to believe that the defendant was intoxicated. The defendant performed field sobriety tests and was arrested for DUII. 311 Or. at 403, 813 P.2d 28. The court held that defendant was not seized *989 until after probable cause existed. "The officer's initial encounter with defendant in stopping his vehicle and imparting information did not significantly restrict, interfere with, or otherwise deprive defendant of his liberty or freedom of movement." Id. at 411, 813 P.2d 28 (emphasis original).
Both Gerrish and Holmes stand for the proposition that a law enforcement officer may temporarily prevent an individual from passing through a public area without "seizing" that person.
Two other cases from this courtWarner and State v. Painter, 296 Or. 422, 676 P.2d 309 (1984)also are informative. See Holmes, 311 Or. at 408, 813 P.2d 28 ("[b]oth Warner and Painter illustrate the distinction between an encounter that intrudes upon no constitutionally protected interest and an intrusion amounting to a `seizure' of the person"). In Warner, two police officers received a report about an armed robbery in which two men were involved. Soon after receiving that report, the officers saw the defendants getting out of a car and entering a bar. The officers waited outside the bar for 10 minutes and then decided to enter the bar for a "routine check." One of the officers exchanged a few words with one of the defendants and then asked the bartender if he had seen any suspicious activity. The bartender told one of the officers that one of the defendants had "just pulled out a wad of money, the size he'd never seen before." That officer was outside when the defendants walked out the front door of the bar. The officer stopped the defendants and asked them to go back into the bar. The defendants did as the officer asked. When they were all inside the bar, the officer asked the defendants to remove their wallets, take out identification, and place the identification on a table. The defendants complied. Warner, 284 Or. at 149-52, 585 P.2d 681. The defendants eventually were arrested and charged with robbery. This court held that the officer had seized the defendants only when the officer asked the defendants to place their identification on the table. Id. at 165, 585 P.2d 681.[4]
In Painter, a deputy was on patrol looking for "suspicious people." He saw the defendant walking in an alley at 3:00 a.m. and asked him what he was doing. The defendant said that he had car trouble and was going to find a telephone. The officer asked the defendant for identification, and the defendant produced, among other things, an expired driver license. The officer retained the identification. The officer patted down the defendant and ran a radio check, which came back clear. The officer then asked the defendant for the make and location of his car. After the defendant answered the officer's questions, the officer returned the defendant's identification to him and left. The officer then located the defendant's car and, through the window, saw what he suspected was a pistol under the driver's seat. The officer waited until the defendant returned to the car and drove away. The officer then stopped defendant for driving while suspended and for carrying a concealed weapon. Painter, 296 Or. at 424-25, 676 P.2d 309. The court held that the officer seized the defendant when he retained the defendant's identification because, at that point, defendant was "unable to leave." Id. at 425, 676 P.2d 309.
Warner and Painter illustrate the extent to which an officer may act before the officer's conduct becomes a seizure. In Warner, no seizure occurred until the officers took possession of a piece of the defendants' property. The police entered the bar in which the defendants sat, spoke with the defendants, and asked the defendants to return to the bar, all without "significantly depriv[ing]" the defendants of their liberty or freedom of movement. Similarly, in Painter, no seizure occurred when the officer stopped the defendant in the alley and asked him what he was doing.
In the light of this court's holdings in Gerrish, Holmes, Painter, and Warner, I am unable to conclude that the facts in this case *990 support a conclusion that the police seized defendant while defendant was inside his house. The police barricaded the street on which defendant's house is located. Gerrish and Dahl show that the police may do that without creating circumstances that give rise to a seizure. Officer Kahut, who was standing on the street, sought to speak with defendant. Again, that fact does not give rise to a seizure. Officer Kahut and the two other officers then remained on the street. The officers were not brandishing their weapons, nor are there any facts in the record suggesting that the officers intended to enter defendant's house. Similarly, there are no facts in the record from which a finder of fact could conclude that the officers intended to restrain defendant's liberty while defendant was in the house.
The only fact that reasonably could support the majority's conclusion that defendant was seized while inside his house is that the dispatcher telephoned defendant and told him to come out of the house with his hands raised. That call, in itself, does not rise to the level of a seizure. In fact, the telephone call, in the absence of the physical presence of the police officers in defendant's house, is less of a restriction on defendant's liberty than was the police conduct in Warner, when the officer standing near the defendants asked that the defendants return to the bar. Similarly, the officer's conduct in Painter, when the officer approached and questioned the defendant in an alley, was a greater restriction on liberty than the telephone call and waiting police officers here.
The facts in this case also do not support a conclusion that defendant believed that the conduct of the police, before he left his house, was a significant restraint on his liberty. Before receiving the telephone call, defendant conducted himself in a manner suggesting that he did not believe that his liberty was being restricted.[5] After he received the telephone call, he remained in his house for 10 minutes. That action supports an inference that defendant did not feel that the call, when made, constituted a significant restraint on his liberty. That restraint occurred only when defendant complied with the order (even assuming that it was an "order") and left the house.

IV. WHAT WAS THE NATURE OF THE SEIZURE OF DEFENDANT?
I agree with the majority's conclusion that, when defendant came out of his house onto the porch, he was seized. I also agree that the officers lacked probable cause to arrest defendant at that moment. However, those conclusions do not mean that the evidence gathered as a result of that seizure necessarily must be suppressed. When the officers had seized defendant, they may have had a reasonable suspicion that defendant had committed a Class A misdemeanor. A citizen's call to the police that a man was waving a gun and coming out of a house could have given the police a reasonable suspicion that defendant was committing the misdemeanor of menacing[6] or recklessly endangering *991 another person.[7] If they had such a reasonable suspicion, then the officers' initial seizure of defendant on the porch was a lawful "stop" of defendant. See ORS 131.605 to 131.615 (providing circumstances under which a police officer may stop a person who the officer "reasonably suspects" may have committed a crime); see also State v. Cloman, 254 Or. 1, 6, 456 P.2d 67 (1969) (establishing that police may "stop" an individual and temporarily detain that individual based on a "reasonable suspicion" that that individual has committed a crime; "[t]his `reasonable suspicion' we deem to be of less quantum than probable cause to arrest").
Soon after the officers seized defendant, they made observations that gave them probable cause to believe that defendant had been driving while intoxicated. The restraint on defendant's liberty between the time the officers seized defendant on his porch and the time the officers made the observations that gave them probable cause to believe that defendant had been driving under the influence of intoxicants was minimal. The officers noticed almost immediately after the seizure of defendant that he was swaying when he walked. They realized that defendant recently had been driving. They spoke with defendant, and he smelled strongly of alcohol. Those facts justified an arrest of defendant, because they gave rise to probable cause that defendant had committed the crime of DUII. Accordingly, if the officers had a reasonable suspicion that defendant had committed a crime when they seized him, the facts that gave rise to probable cause that defendant had committed the crime arose when the police lawfully were investigating that suspicion. Under those circumstances, the seizure of defendant would have been lawful, and the evidence need not be suppressed. If, on the other hand, the officers did not have a reasonable suspicion that defendant had committed a crime when they seized him on the porch, that seizure would have violated Article I, section 9, and suppression would be required.
The trial court did not make findings concerning whether the officers were investigating a reasonable suspicion that defendant had committed a crime. Accordingly, I would remand this case to the trial court for further findings.
The majority fails to discuss the nature of the seizure of defendant in this case. The majority explicitly acknowledges that, in Holmes, this court recognized that both "stops" and "arrests" are seizures requiring different levels of justification for police action. Yet, the majority never explains why the initial seizure in this case is an "arrest" rather than a "stop" under Holmes. By measuring the police actions against the standard of probable cause, the majority implicitlybut without explanationappears to conclude that the police arrested defendant when the police first seized him. That conclusion is, in my view, unwarranted in view of this court's prior cases.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
[2] The Fourth Amendment to the Constitution of the United States, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[3] Officer Kahut testified at the suppression hearing that the anonymous telephone caller said that there was a "man waving a gun on the front porch" at a specified address. Officer Willard testified that the anonymous caller reported that there was a "man with a gun walking in and out of a house" at a specified address. In his oral findings, the trial judge said that an anonymous caller reported that there was "a man waving a gun on the front porch."
[4] At the suppression hearing, Officer Kahut testified as follows:

"ATTY: And when you arrived, some calls were taking place to get Mr. Dahl out of the home, correct?
"KAHUT: Yes.
"ATTY: And when Mr. Dahl eventually came out of the home, did he come out with his hands up?
"KAHUT: Yes, he did.
"ATTY: And at that time, was he under arrest?
"KAHUT: No, he was not.
"ATTY: Was he ordered to come out with his hands up?
"KAHUT: Yes, he was."
Officer Hoesley testified:
"ATTY: Would Officer Kahut's testimony be inaccurate when she said that Mr. Dahl came out of the house ...
"HOESLEY: Yeah, she brought him out of the house like that, yes.
"ATTY: And he was, was it your understanding, he was ordered to come out of the house with his hands up?
"HOESLEY: Yes, he was.
"ATTY: Okay, was he free to go at that time?
"HOESLEY: No, he was not."
[5] Portland City Code section 3.20.110 provides in part:

"The police force of the City shall at all times of the day and night within the boundaries of the City preserve the public peace, prevent crime, arrest offenders, protect rights of persons and property, guard the public health, preserve order, * * * and generally obey and enforce all ordinances of the City Council and criminal laws of the State and of the United States."
[6] See ORS 131.605 through ORS 131.625 (stating standard for stopping persons by police officers) and ORS 131.605(4) (defining the phrase "reasonably suspects").
[7] "An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." State v. Stevens, 311 Or. 119, 126, 806 P.2d 92 (1991).
[8] ORS 133.235(5) provides that, "[i]n order to make an arrest [for certain offenses], a peace officer may enter premises in which the officer has probable cause to believe the person to be arrested to be present."
[9] We note that, although the conclusion in State v. Olson was based on "the words of both the Oregon and the United States Constitutions," there was no separate and definitive analysis under the Oregon Constitution. We now wish to state that that analysis is correct under Oregon constitutional law.
[10] "If probable cause to arrest is all a police officer needs to make a constitutionally reasonable forced entry into a person's house to arrest him, it is obvious that there will be little necessity for the officer ever to get a warrant; the requirement for entry without a warrant and for getting a warrant would be the same. If an officer does not have to have a warrant to force an entry into the house of a person for his arrest, the officer surely does not have to have one to enter any place else for that purpose. Yet the constitutional provisions obviously must contemplate situations in which a warrant is required." Olson, 287 Or. at 162, 598 P.2d 670.
[11] Our disposition of this case under Oregon law makes it unnecessary to address defendant's Fourth Amendment claims.
[1] In defendant's brief to the Court of Appeals, he wrote that the police dispatcher called him and "told" him to come outside with his hands up.
[2] I reach the constitutional issues, because there is no potential subconstitutional basis for decision. In that regard, I note that the majority's discussion of various statutes, 323 Or. at ___, 915 P.2d at 983-84, appears to serve no function.
[3] Article I, section 9, of the Oregon Constitution, provides in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."
[4] In Warner, the state conceded that the officers lacked a reasonable suspicion that the defendants had committed the crimes when they were seized. 284 Or. at 166, 585 P.2d 681. Accordingly, the court had no occasion to decide whether the "seizure" of defendants was a "stop" or an "arrest."
[5] Defendant summarizes the facts leading to his arrest as follows:

"[Defendant] * * * had been at a local tavern where he drank beer and shot pool from approximately 4:00 to 7:00 p.m. He drank three pints of beer during that three hour period but did not become intoxicated from it. He then walked home which was just a few blocks from the tavern.
"[Defendant] went into his house and busied himself recording music on cassette tapes. Sometime later he noticed that police were gathering at either end of his block. When he saw the police barricading the street he decided to move his car to safety by driving it around the block and into his driveway. Once back in his house he drank several shots of tequila and some beer. Sometime later he heard the police shouting outside. He looked outside to see what the problem was. One of the officers yelled for him to get off the porch. Upon hearing this, he went back inside his house and shut the door."
Before receiving the telephone call, defendant acted in a manner that showed that he did not believe that he was restrained by the police. When he saw the police arrive on his street, he left, and returned to, his house. He remained in his house and drank. He looked out to see what was going on in the street and then returned to his house.
[6] ORS 163.190 provides:

"(1) A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury.
"(2) Menacing is a Class A misdemeanor."
[7] ORS 163.195 provides:

"(1) A person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.
"(2) Recklessly endangering another person is a Class A misdemeanor."